UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

**MARQUETTE TRANSPORTATION COMPANY, LLC**   **PLAINTIFF**

v.   No. 5:22-cv-24-BJB

**EMERALD INTERNATIONAL CORPORATION**   **DEFENDANT**

\*\*\*\*\*

### FINDINGS OF FACT & CONCLUSIONS OF LAW

This case involves fifteen barges, 100,000 tons of coal, and five unpaid invoices. Emerald International Corporation contracted with Marquette Transportation Company to ship a customer's coal along the waterways of Kentucky and Indiana to Louisiana. Complaint (DN 1) ¶¶ 9–10, 13. Marquette delivered the coal in two shipments, and the last barge docked in Convent, Louisiana, in early November, 2021. But Emerald refused to pay the balance of five shipping invoices, "alleging that Marquette initially and substantially breached the contract" by delivering the second shipment late. Emerald Post-Trial Brief (DN 68) at 4 n.20; *see* Trial Tr., Vol. 2 (DN 65) at 79:23–80:4; *id*. at 93:15–22. According to Emerald, the parties' contract required Marquette to *deliver* all 100,000 tons of coal by the end of October 2021. Trial Tr., Vol. 1 (DN 63) at 16:23–17:14. But as Marquette sees things, the relevant provision—"Term: September–October, 2021"—established only a *loading* deadline at the conclusion of October 2021. *See id.*; Transportation Agreement (DN 1-1) at 1. Thinking it had held up its end of the deal, Marquette wanted to get paid. So Marquette sued Emerald for breach of contract, seeking payment of the past-due shipping invoices, prejudgment interest, and litigation expenses. Complaint ¶¶ 18–20.

Three years of litigation followed, culminating in a two-day bench trial. The Court heard testimony from four witnesses: Blake Denton and Ricky Martin, vice presidents at Marquette; and Steven Weber and Jack Wells, a vice president and the President of Emerald, respectively. At the Court's request, the parties filed post-trial briefs addressing each of the disputed elements of their claims and defenses. *See* DNs 68, 70–72.

During the bench trial, Marquette established by a preponderance of the evidence that Emerald breached the parties' contract. So the Court awards Marquette damages and will enter judgment in its favor. In accordance with Federal

Rule of Civil Procedure 52(a), the Court enters the following findings of fact and conclusions of law in support of that determination.[1]

## I. THE FACTUAL RECORD & FINDINGS

The parties disagree about how to interpret the contract, but they mostly don't dispute the events giving rise to this litigation. The Court finds the following facts based on the largely undisputed testimony presented at trial.

Emerald International Corporation is a Kentucky business that exports coal internationally. One of its customers hired Emerald to deliver 100,000 tons of coal from Indiana and Kentucky to Louisiana. So Emerald contracted with Marquette Transportation Company in August 2021 to transport that cargo in two 50,000-ton shipments—one in September, the other in October. *See* Complaint ¶¶ 9–13; Transportation Agreement at 1. Both parties agree that their written contract of affreightment[2] closely resembles the industry standard. Trial Tr., Vol. 1 at 21:16–25. The Transportation Agreement provides shipping and payment details, including a "[t]erm" of "September–October, 2021." DN 1-1 at 1. It also gives Emerald "specified amounts of 'free time'" to load or unload Marquette's barges at each end of their journey. Complaint ¶ 12; *see* Transportation Agreement at 1. And Emerald promised to pay Marquette "demurrage" fees[3] if Emerald failed to timely load or unload Marquette's barges. Transportation Agreement at 2. All payments required under that contract were due within 30 days of their corresponding invoice date. *See id.* at 1, 4.

But trouble soon found the parties. A few days after they struck their bargain, "Hurricane Ida struck the Louisiana coast." Marquette MSJ (DN 28-1) at 2. Understandably, that stalled shipping operations in the region. Complicating matters further, Alliance Resource Partners, L.P.—a third-party loading company—refused to load Emerald's second coal shipment aboard Marquette's barges until

---

[1] Insofar as any finding of fact reflects a legal conclusion, it should be considered a conclusion of law. And insofar as any conclusion of law reflects a finding of fact, it should be considered a finding of fact.

[2] A contract of affreightment is an agreement "with a ship-owner to hire his ship, or part of it, for the carriage of goods." BLACK'S LAW DICTIONARY 60 (6th ed. 1990) (citations omitted).

[3] "Demurrage" refers to "[l]iquidated damages owed by a charterer to a shipowner for the charterer's failure to load or unload cargo by the agreed time." *Liberty Mutual Ins. v. Royal White Cement, Inc.*, 769 F. Supp. 3d 513, 521 (E.D. La. 2025) (citing BLACK'S LAW DICTIONARY (12th ed. 2024)).

2

Emerald paid overdue invoices it owed Alliance.[4] Trial Tr., Vol. 1 at 92:8–95:23. Mindful of the Alliance–Emerald payment holdup, Marquette decided to redirect six of the fifteen barges it had initially allotted for Emerald's second coal shipment toward other customers' needs in order to "keep the flow of barges moving." *Id*. at 94:10–97:4; *see also* Transportation Agreement at 1 ("Equipment: Open Hopper Barges – 15 barge unit tows."). On the very same morning that Alliance told Marquette of the delay (October 12), Marquette told Emerald about it, plus its intention to reallocate six of the barges originally reserved for Emerald's coal. Trial Tr., Vol. 1 at 97:7–99:25. Three days later, Marquette had pulled the barges, and Emerald's Steven Weber called Lance Wrinkle—a Marquette representative—to ask why. *See id*. at 99:16–22. The outcome of that conversation is not clear, but what happened next is: That same day, Alliance loaded the nine remaining barges with Emerald's coal. *See id*. at 100:4–7. And Marquette couldn't secure replacement barges for the six it had diverted until October 18–22. *See id*. at 100:7–9. Meanwhile, on October 19, Marquette declared a *force majeure* event "[d]ue to the ongoing delays at loading and unloading facilities in the gulf as a result of the continuing disruptive impacts from Hurricane Ida," rendering Marquette "unable to timely drop and pick up barges resulting in delays to current and future trips." Force Majeure Letter (DN 28-4).

That affected Emerald (legally) and Marquette (commercially) because, as both parties agree, Emerald's October shipment had a "laycan" period[5] of October 25–November 5. Trial Tr., Vol. 1 at 88:15–24 (Marquette); September 29 Emails (DN 62-10) at 1 (Emerald). As Emerald emphasized at trial, it had only until November 5 to get the coal to its buyer; if it didn't, the buyer could cancel. How this affected the Emerald-Marquette affreightment contract—which didn't mention laycan, and which includes an indemnity provision covering consequential damages, *see* Transportation Agreement at 6—is not entirely clear, as addressed below.

Despite the *force majeure*, Marquette eventually did deliver Emerald's coal. But not until November 7—seven days after the affreightment deadline (at least as Emerald construed it) and two days after Emerald's laycan period ended. Trial Tr., Vol. 1 at 154:9–15. By the end of this voyage, therefore, Marquette had undoubtedly *loaded* the October shipment during the "September–October, 2021" window

---

[4] Emerald disputes that its payments to Alliance were past due. *See* Emerald Post-Trial Brief at 8. But whether Emerald's payments to Alliance were indeed overdue does not affect the Court's findings. Whatever Alliance's reason, the parties do not dispute that Alliance refused to load the barges and that it told Marquette as much.

[5] "'Laycan' is a maritime term that refers to the window of time during which a vessel must arrive at the port … to avoid cancellation by the charterer." *Kolmar Americas, Inc. v. Koch Supply & Trading, LP*, No. 10-cv-7905, 2011 WL 6382566, at *2 n.1 (S.D.N.Y. Dec. 15, 2011).

mentioned in the contract, and did in fact deliver the coal to its specified destination (notwithstanding the *force majeure*), but that shipment didn't *arrive* until November, by which time the "September–October, 2021" period had passed and Emerald's laycan had expired.

After the delivery, Marquette invoiced Emerald for freight and demurrage charges, *see* Invoices (DNs 1-2–1-6), but Emerald refused to pay for the untimely delivery. *See* Trial Tr., Vol. 2 at 79:23–80:4; *id*. at 93:15–22. Marquette sued Emerald for breach of contract, seeking the balance owed ($381,896.32), prejudgment interest, court costs, and attorney's fees. Complaint ¶¶ 18–20. Emerald denies breaching the Transportation Agreement: instead Marquette breached by "failing to timely provide the requisite number of barges pursuant to the agreement's terms" and failing to deliver the second 50,000-ton shipment of coal by the end of October 2021. Answer (DN 8) ¶ 31. Emerald also asserts a "setoff" defense, which "seeks to reduce any recovery to which Marquette claims to be entitled … by the damages owed to Emerald arising from Marquette's breach." Response to Marquette MSJ (DN 32) at 2–8.

## II. Contract Interpretation

These factual findings frame the main dispute: the meaning of the provision "Term: September–October, 2021." Transportation Agreement at 1. Marquette submits that this "Term Provision" signifies only a cargo-loading period; Emerald counters that it sets a delivery deadline. Trial Tr., Vol. 1 at 16:23–17:14. Neither party believes the Term Provision is ambiguous. *See id*. at 17:19–22 (Emerald); Marquette Trial Brief at 2–6. But applying the law the parties chose to govern their bargain, the Court disagrees and considers extrinsic evidence of the provision's meaning. And that evidence favors Marquette's reading of the contract.

### A. Choice of law

As an initial matter, the parties agree that the Transportation Agreement contains a choice-of-law clause that governs this dispute. The contract, each concedes, should be read "in accordance with the general maritime laws of the United States." Transportation Agreement at 6. Then the water grows murkier, however: "To the extent that state law is … needed to supplement general maritime law," the provision specifies that "the statutes, rules and case law of the Eastern District of Louisiana" apply. *Id.* District courts, of course, don't enact "statutes." And a term presupposing such Cajun kritarchy caused puzzlement, to say the least, during trial. Not to worry, trial counsel agreed; this provision offers less than meets the eye. To them, it merely "sweep[s] in the law of the *state* of Louisiana" to fill any gaps left by the general maritime law. Trial Tr., Vol. 1 at 5:9–16 (emphasis added). Fortunately, no question of significance here requires the Court to wade into this interpretive bayou. And "[c]hoice-of-law provisions in maritime contracts"—even of the strangest variety, apparently—"are presumptively enforceable." *Great Lakes Ins. SE v. Raiders*

4

*Retreat Realty Co.*, 601 U.S. 65, 70 (2024). Since neither party challenges this one, general maritime law controls this dispute as supplemented, if necessary, by Louisiana law.

### B. The Term Provision is ambiguous

When interpreting a maritime contract, the Court applies "[f]ederal maritime law," which "includes general principles of contract law." *CITGO Asphalt Refining Co. v. Frescati Shipping Co.*, 589 U.S. 348, 355 (2020) (quoting 2 THOMAS. J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 11:2 (6th ed. 2018)). That includes "general principles of contract interpretation." *St. Clair Marine Salvage, Inc. v. Bulgarelli*, 796 F.3d 569, 574–75 (6th Cir. 2015) (quotation marks omitted); *see also Shallow Water Equip., L.L.C. v. Pontchartrain Partners, L.L.C.*, 620 F. Supp. 3d 495, 502 n.4 (E.D. La. 2022) ("Federal maritime law incorporates general principles of contract construction…").

As this rule suggests, contract interpretation is typically a question of law. *See, e.g., In re Palm Springs II, L.L.C.*, 106 F.4th 406, 418 (5th Cir. 2024) (citation omitted). But if a maritime contract "contains ambiguities, it generally becomes the task of the fact-finder to use extrinsic evidence to determine the intent of the parties," which is "a matter of fact." *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 422 (6th Cir. 2008). And a contract is ambiguous "if the language is susceptible to two or more reasonable interpretations." *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001) (quotation marks omitted). By contrast, a contract is unambiguous when "it can be given only one reasonable interpretation." *Barrios v. Centaur, L.L.C.*, 121 F.4th 515, 518 (5th Cir. 2024) (citation omitted).

Here, the meaning of "Term: September–October, 2021" is ambiguous. The first word, "Term," has many meanings,[6] but its usage in the Transportation Agreement appears temporal. After all, the three words that follow all refer to time, in the form of a two-month range. Time for what? Loading, delivery, or something else entirely? In a vacuum, this language could—as Marquette asserts—set a loading deadline expiring at October's end. On this reading, the contract didn't set a firm delivery deadline—and didn't have to. Instead, once the barges were loaded, the parties' interests would converge and encourage delivery "as rapidly as possible." Trial Tr., Vol. 1 at 83:19. But this language could also mean, as Emerald counters, that Marquette guaranteed delivery of the coal by the end of October. *See* Emerald

---

[6] Perhaps, like the infamous *term* "jurisdiction," too many meanings. Or rather too many to safely appear in an off-the-rack affreightment contract. *See Arbaugh v. Y&H Corp.,* 546 U.S. 500, 510 (2006) (Ginsburg, J.) (regretting that "jurisdiction" had become a word of "many, too many, meanings") (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90 (1998) (Scalia, J.)) (quoting *United States v. Vanness*, 85 F.3d 661, 663 n. 2 (D.C. Cir. 1996) (Randolph, J.)).

Post-Trial Brief at 2–4. The spare contract language that drives this dispute—a mere four words, three of which are calendar dates—reasonably supports both contract interpretations. A "term" of loading and a "term" of delivery are equally plausible constructions of those few words.

Both parties put on witnesses who testified credibly in support of their interpretations. Marquette offered two witnesses—Denton and Martin—each of whom testified that the Term Provision established only loading deadlines for the coal shipments. *See* Trial Tr., Vol. 1 at 30:9–17 (Denton); *id*. at 83:5–12 (Martin). Emerald invited competing testimony from Weber and Wells, who asserted that the "September–October, 2021" term provided a final delivery date for the coal shipments. *See* Trial Tr., Vol. 1 at 168:14–169:6 (Weber); Trial Tr., Vol. 2 at 59:11–17 (Wells). The conflicting but persuasive testimony heard at trial "indicates the parties held differing views as to [the contract's] interpretation." *See Keiland Constr., L.L.C. v. Weeks Marine, Inc.*, 109 F.4th 406, 417 (5th Cir. 2024). That testimony, none of which was implausible, lends at least some support to the notion that the Term Provision is ambiguous. *See id*.

Do the structure and context of the contract resolve that facial ambiguity? *See, e.g.*, *Hanover Nat'l Bank v. Suddath*, 215 U.S. 110, 120 (1909) (asking whether ambiguous terms "are susceptible of a meaning in harmony with the context"); *see also* Eric A. Posner, *The Parol Evidence Rule, the Plain Meaning Rule, and the Principles of Contractual Interpretation*, 146 U. PA. L. REV. 533, 570 (1998) ("[A] judge can determine that a writing is ambiguous … only if he or she knows the commercial context to which the writing refers."). Three such considerations support Marquette's reading, though they do not fully dispel the ambiguity.

First, the Transportation Agreement provides that "[a]ll decisions concerning the transportation of cargo,"—including "when the cargo will be moved"—are "at the sole discretion of [the] Carrier," that is, Marquette. Transportation Agreement at 4. This language indicates that the bargain afforded Marquette considerable discretion in the shipment's timing. But it doesn't specifically answer the question when the cargo would be *delivered*. And therefore it wouldn't necessarily override more specific language to that effect—which is, of course, what Emerald sees in the Timing Provision. *See Royal Insurance*, 525 F.3d at 420 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 203 (A.L.I. 1981) ("Well-founded principles of contract law establish that 'specific terms and exact terms are given greater weight than general language.'").

A second provision carries this carrier discretion further still, seemingly clear past Emerald's objections rooted in the laycan period: Marquette wasn't "bound to transport any cargo by any particular barge … or in time for any particular market" and wouldn't "be liable for deviations or delays in shipment." Transportation

6

Agreement at 3. Given the ample discretion expressed here, the implicit limit Emerald reads into the Term Provision becomes less plausible. A "cardinal principle of contract construction," after all, is "that a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) (citing RESTATEMENT (SECOND) OF CONTRACTS § 203(a)). Marquette's interpretation of the Term Provision to impose a loading rather than unloading deadline harmonizes with these neighboring provisions far more easily than Emerald's approach.

A third consideration reinforcing these textual inferences is the background principle of contract interpretation that timing is generally "not of the essence in a contract unless the contract so states." *USA Network v. Jones Intercable, Inc.*, 729 F. Supp. 304, 309 (S.D.N.Y. 1990) (collecting treatises). As defense counsel noted during trial, the Transportation Agreement includes no provision emphasizing prompt delivery (though plenty of other admiralty contracts do). Trial Tr., Vol. 1 at 169:7–11. Does the provision "Term: September–October, 2021" render time of the essence if given Emerald's construction? Not strictly speaking; it would merely impose a deadline. Which is why this heuristic merely supports rather than wins Marquette's case. But reading the Term Provision to signify a loading deadline is, on balance, more consistent with this default rule against urgent performance.

Still, although these principles support Marquette's reading, they do not entirely dispel the ambiguity. The contract terms giving Marquette discretion to move the coal how it pleased could be read to afford it discretion only *within* the prescribed timeline. Though a firm deadline would reduce those terms' value to Marquette, it would not nullify the terms or their utility. And although time is not generally of the essence unless a contract says it is, Emerald's whole argument is that this contract *does* say it is. That reading may not be the best one, but it is a "reasonable" one. *City of Wyandotte*, 262 F.3d at 585. So the Court finds that the Term Provision remains ambiguous. *See* 11 WILLISTON ON CONTRACTS § 30:4 (4th ed., May 2025 update) ("A contract is ambiguous if a genuine doubt appears as to its meaning … after applying established rules of interpretation" and "examin[ing] the context of the entire integrated agreement … cognizant of customs, practices, usages, and terminology as generally understood in the particular trade or business.").

### C. Customary usage supports Marquette's interpretation

So text and context do not fully resolve the Term Provision's ambiguity; what about customary usage? *See Royal Insurance*, 525 F.3d at 422 ("When a contract is ambiguous, it is for the [factfinder] to determine the meaning of its terms, … based upon evidence of the surrounding circumstances and the practical construction of the parties," including "extrinsic parol evidence.") (cleaned up). At the evidentiary hearing, both parties offered evidence of customary and contract-specific usage. *See*

7

*City of Wyandotte*, 262 F.3d at 586 ("Where a contract provides little guidance in interpreting a disputed term, we may properly look to … the standards and practices within the relevant industry … and to how the parties' actions during the pendency of the agreement have reflected an understanding of the term.") (citations omitted); *see also M&G Polymers USA v. Tackett*, 574 U.S. 427, 439 (2015) ("Although a court may look to known customs or usages in a particular industry to determine the meaning of a contract, the parties must prove those customs or usages using affirmative evidentiary support."). Although that evidence is not totally one-sided either, it—like the contextual points already considered—largely favors Marquette's understanding of the Transportation Agreement.

Marquette's Blake Denton and Ricky Martin testified credibly in support of Marquette's position. *See* Trial Tr., Vol. 1 at 23:22–72:15; *id.* at 78:4–155:21. Denton explained that "September–October, 2021" contemplated only "the load-out months at origination." *See id.* at 30:9–17. What's more, since 1997, Denton has worked on "thousand[s]" of affreightment contracts that corroborate Marquette's interpretation of the Transportation Agreement's two-month term. *Id.* at 28:11. Those contracts don't just include Marquette's; similar provisions "from Crounse, Ingram, [and] other players in the industry" scheduled loading, not delivery, deadlines. *Id.* at 28:12–29:1, 30:6–17. That "industry standard," Denton testified, reflects "the unknowns in [the shipping] business"—"weather, … high water, … low water, … locks [and] infrastructure that's pretty antiquated, … fleet delays," equipment malfunctions, and more. *Id.* at 28:19–29:24. "[N]ever … in [his] career" did Denton see "a guaranteed delivery time"—in a Marquette contract or a competitor's. *Id.* at 32:17–32:24; *see also id.* at 40:1–40:7.

Martin's testimony was no less persuasive. While employed at Marquette, he's worked on nearly 200 contracts of affreightment that closely resemble the one before the Court. *See id.* at 82:3–12. Based on his experience, the two-month term indicated that the coal "would be loaded within that timeframe." *Id.* at 81:24–83:12. And, to the best of his knowledge, Marquette had *never* guaranteed a delivery date in any of the contracts of affreightment he'd seen over his 14-year tenure. *See id.* at 90:14–23. As the Supreme Court has recognized in the maritime context, this "evidence of 'custom and usage' is relevant to determining the parties' intent when an express agreement is ambiguous." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 674 n.6 (2010) (citation omitted).[7]

---

[7] See also the authorities cited in *Stolt-Nielsen*: *Great Circle Lines, Ltd. v. Matheson & Co.*, 681 F.2d 121, 125 (2d Cir. 1982) (same); *Samsun Corp. v. Khozestan Mashine Kar Co.*, 926 F. Supp. 436, 439 (S.D.N.Y. 1996) ("[W]here as here the contract is one of charter party, established practices and customs of the shipping industry inform the court's analysis of what

Emerald's two witnesses likewise shared credible testimony, though it pointed the other way. *See* Trial Tr., Vol. 1 at 162:19–179:15 (Weber); Trial Tr., Vol. 2 at 3:13–30:1 (same); *id.* at 33:16–83:8 (Wells). Weber, who's been involved in maritime shipping for more than 40 years and does "a little bit of everything" at Emerald, Trial Tr., Vol. 1 at 163:4, stated that industry custom favors Emerald's position: The "September–October, 2021" term sets an end-of-October delivery deadline, *see id.* at 169:7–170:13. That reflects "common sense," he testified, because only end-of-October delivery would meet Emerald's "vessel schedule" and allow it to get the coal to its customer before the laycan expired. *Id.* at 168:14–169:6. (Whether and how this was known to Marquette's draftsman, he didn't say.)

Wells, whose career at Emerald has spanned 34 years, said something similar. *See* Trial Tr., Vol. 2 at 34:5–7; *id.* at 82:13–17. "[F]rom day one," Wells added, "it was always the assumption" that Marquette would load the second shipment by the middle of October; the contract said "September, October," and Emerald "told [Marquette]" that they wanted "mid September and mid October." *Id.* at 37:11–18. On Wells's telling, however, the contract didn't need to specify when during October Marquette would load the barges. The contract was only "a framework" focused on shipping and demurrage rates, free time, and "those kinds of things." *Id.* at 39:18–23. Because "everybody" in the maritime-shipping industry "works together," "99 percent of the time, you never have to look at the contract … again" after signing, and Emerald expected a seamless end-of-October delivery. *Id.* at 39:21–23.

But Denton's and Martin's discussions of industry custom are particularly persuasive. Between them, they testified to several decades' worth of maritime custom across many locations and customers—including countless other standardized maritime agreements—that reflect a practice of not setting hard delivery deadlines. That testimony, born of long experience with not just their own but independent maritime firms' contracts, supports the same understanding of analogous term provisions. *See* Trial Tr., Vol. 1 at 28:12–29:2, 30:6–17; *see also id.* at 21:16–21:25 (counsel for both parties agreeing that affreightment agreements used by Marquette's industry peers would look "similar"). In this "broader context of the linguistic usages of [nonparties]," Arthur L. Corbin, *Interpretation of Words and the Parol Evidence Rule*, 50 CORNELL. L. REV. 161, 167 (1965), the Court finds that the facially ambiguous Term Provision is best read to establish only a loading window.

The facts as set forth in the parties' filings and at trial, therefore, support Marquette's understanding of the contract: "September–October, 2021" reflects a loading window rather than a delivery deadline.

---

the parties agreed to"); Charles M. Hough, *Admiralty Jurisdiction—Of Late Years*, 37 HARV. L. REV. 529, 536 (1924) ("[M]aritime law is a body of sea customs," and the "custom of the sea … includes a customary interpretation of contract language").

9

### III. CONCLUSIONS OF LAW

Because a preponderance of the record evidence indicates that Emerald breached its contract with Marquette, the Court will enter judgment in favor of Marquette and orders Emerald to pay Marquette the balance of its overdue invoices, prejudgment interest, and reasonable litigation expenses.

**A. Liability**

Emerald is liable to Marquette for breaching the Transportation Agreement. "The elements of a breach-of-contract claim under federal maritime law are (1) a contract between the parties; (2) a breach of that contract; and (3) damages." *Central Boat Rentals, Inc. v. Pontchartrain Partners, LLC*, 744 F. Supp. 3d 635, 639 (E.D. La. 2024) (citations omitted). And "[t]he law is settled in admiralty actions that plaintiffs must prove their claims by a preponderance of the evidence, whether direct or circumstantial." *F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1360 (S.D. Fla. 2007) (quotation marks omitted). "Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows the fact sought to be proved is more probable than not." *Hicks v. BP Exploration & Production, Inc.*, 310 F. Supp. 3d 754, 758 n.7 (E.D. La. 2018) (quotation marks omitted).

By this standard, Marquette established all three elements required to succeed on its maritime breach-of-contract claim against Emerald. So the Court concludes that Emerald alone breached the Transportation Agreement by failing to tender timely payment to Marquette.

*First*, Marquette and Emerald indisputably entered a contract. Indeed, each party seeks to enforce the terms of the Transportation Agreement against the other. *See* Complaint ¶ 16 (Marquette); Emerald Post-Trial Brief at 2–10. Because both parties agree that they entered a contract, the first prong of Marquette's breach-of-contract claim is easily satisfied. *See Central Boat Rentals*, 744 F. Supp. 3d at 639.

*Second*, Emerald breached its contract with Marquette by failing to timely pay the shipping invoices. Under the Transportation Agreement, Emerald agreed to pay its invoices from Marquette within 30 days of their origination. *See* Transportation Agreement at 2 ("Payment: Net 30 days from invoice date."). Emerald's payments to Marquette were due on November 19, November 28, December 5, December 6, and December 10, 2021. *See* Complaint ¶ 17. And Emerald's witnesses admit that it didn't pay the invoices. *See* Trial Tr., Vol. 2 at 52:13–23, 79:23–80:4, 93:15–22.

Emerald counters that *Marquette* breached the contract and thus extinguished its obligation to pay. But as explained, a preponderance of the evidence—including trial testimony, industry custom, and Marquette's prior dealings—indicates that the

Term Provision imposed only a loading deadline against Marquette. So the Court finds no predicate breach on Marquette's part to excuse Emerald's nonpayment.

And even if the Term Provision did impose a delivery deadline on Marquette, it's not obvious that Marquette's breach would free Emerald of its duty to pay the invoices. Under admiralty law, a *material* breach of contract may discharge the nonbreaching party's future duties to perform. *See, e.g.*, *Shelter Forest Int'l Acquisition, Inc. v. COSCO Shipping (USA) Inc.*, 475 F. Supp. 3d 1171, 1184 (D. Or. 2020) (collecting maritime cases). But maritime courts "have consistently declined to find unreasonable delay, or even nondelivery resulting from the carrier's negligence, to constitute a deviation" capable of excusing contract duties. *Id.* (delay in shipping insufficient to excuse subsequent nonperformance of contract); *see also Engineered Arresting Systems Corp. v. M/V SAUDI HOFUF*, 46 F. Supp. 3d 302, 309 (S.D.N.Y. 2014) ("[A] failure to properly handle, stow, care, or deliver cargo, never has constituted deviation.") (quotation marks omitted).

Emerald gives the Court little reason to think Marquette's delay met this high bar. To start, the delay was short: Marquette's final barges carrying Emerald's coal arrived on November 7, only two days after Emerald's third-party laycan date of November 5. *See* Trial Tr., Vol. 1 at 154:9–15. Yet Emerald's witnesses offered no testimony that a two-day delay is commercially unreasonable under the circumstances. And how can the Court find that Marquette's delay was unreasonable without evidence of industry custom? *See, e.g.*, *Amazon Produce Network v. M/V LYKES OSPREY*, 553 F. Supp. 2d 502, 508–10 (E.D. Pa. 2008); *Leather's Best International v. MV Lloyd Sergripe*, 760 F. Supp. 301, 312 (S.D.N.Y. 1991).

Without any such evidence, the Court finds that this short delay was reasonable in light of Hurricane Ida and the confusion surrounding Emerald's payment to Alliance. So even if delay were breach, and even if unreasonable delays excused performance, *this* delay would not excuse Emerald's nonpayment. Accordingly, the Court concludes that Emerald breached the contract by failing to pay the invoices.

*Third*, Marquette sustained injury due to Emerald's failure to pay the invoices. By refusing to pay, Emerald cost Marquette, at the very least, the amount due on the invoices (less any appropriate deductions). *See, e.g.*, *Drinnon Marine, LLC v. Four Rivers Towing of Alabama, LLC*, 549 F. Supp. 3d 505, 517–19 (E.D. La. 2021).

\*\*\*

Emerald's breach-of-contract and "setoff" defense against Marquette necessarily fail because Marquette fully complied with the terms of the Transportation Agreement. Emerald accuses Marquette of breaching their contract by failing to deliver all 100,000 tons of coal consistent with the Transportation

11

Agreement's timeline and number of barges. Emerald asks the Court to reduce Marquette's recovery by the amount "arising from Marquette's breach of the parties' contract." Response to Marquette MSJ at 8. Having found no breach on Marquette's part, *see* above at 7–8, the Court declines to offset Marquette's recovery by any amount.

### B. Damages

To remedy Emerald's breach, Marquette is entitled to the outstanding payments. Courts also recognize that maritime plaintiffs may recover attorney's fees by operation of contract, and prejudgment interest in nearly all maritime breach-of-contract cases. *See Cheramie Marine, LLC v. Freedom Well Services, LLC*, No. 15-cv-324, 2015 WL 7306438, at *1 (E.D. La. Nov. 19, 2015) ("Under general maritime law, in the absence of a federal statute or a provision for attorney's fees in an enforceable contract, litigants must pay their own attorney's fees."); *Offshore Marine Contractors, Inc. v. Palm Energy Offshore, L.L.C.*, 779 F.3d 345, 351 (5th Cir. 2015). And this contract specifies that Emerald will pay any "attorney's fees incurred in seeking collection of any unpaid … charges." Transportation Agreement at 4. So the Court finds that in response to Emerald's breach of contract, Marquette is entitled to payment of the five invoices, plus prejudgment interest, and litigation expenses (as outlined in the contract). And in light of this finding, the Court directs Emerald to pay the five overdue invoices, prejudgment interest, attorney's fees, and court costs to Marquette in accordance with the procedures below.

*1. The Unpaid Invoices.* Marquette requests the balance of its unpaid invoices from Emerald. "It is fundamental contract law that a party that breaches a contract is liable for the damages caused by its failure to satisfy its contractual obligations." *Central Boat Rentals*, 744 F. Supp. 3d at 639 (quotation marks omitted). As discussed above, Emerald breached its contract with Marquette by failing to pay its invoices in a timely manner. Marquette, meanwhile, fulfilled its contractual duties by loading Marquette's coal within the agreed-upon term. So the Court orders Emerald to pay Marquette the total balance of the five overdue invoices: $381,896.32. *See, e.g.*, *id.* at 640–41 (awarding plaintiff value of overdue invoices for maritime breach-of-contract claim); *OOCL (USA) Inc. v. Transco Shipping Corp.*, No. 13-cv-5418, 2015 WL 9460565, at *7 (S.D.N.Y. Dec. 23, 2015) (same).

*2. Prejudgment Interest.* Marquette is also entitled to prejudgment interest from Emerald on its past due invoices. Courts sitting in admiralty recognize "'the bedrock premise that an award for prejudgment interest in actions under the general maritime law is the rule rather than the exception,' and that 'prejudgment interest must be awarded unless unusual circumstances make an award inequitable.'" *Central Boat Rentals*, 744 F. Supp. 3d at 640 (quoting *Ryan Walsh Stevedoring Co. v. James Marine Services, Inc.*, 792 F.2d 489, 492 (5th Cir. 1986)). That money is

intended "to compensat[e] for the use of funds to which the plaintiff was entitled, but which the defendant had use of prior to judgement." *Offshore Marine Contractors*, 779 F.3d at 351 (quotation marks omitted). "Prejudgment interest in an action for breach of contract is allowable from the date the debt is due." *Central Boat Rentals*, 744 F. Supp. 3d at 640 (quotation marks omitted). "Admiralty courts," moreover, "enjoy broad discretion in setting prejudgment interest rates. They may look to the judgment creditor's actual cost of borrowing money, to state law, or to other reasonable guideposts indicating a fair level of compensation." *Offshore Marine Contractors,* 779 F.3d at 351 (quotation marks omitted); *see* 1 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 3-21 (4th ed. 2004).

Here, Emerald's payments to Marquette were due on various dates: November 19, November 28, December 5, December 6, and December 10, 2021. *See* Complaint ¶ 17. And Marquette's invoices supply a relatively modest 1.5% interest rate, which it asks the Court to apply to this litigation. *See* Marquette Post-Trial Brief (DN 70) at 9. That rate is lower than Louisiana's statutorily provided judicial-interest rates for the relevant years, 2022–2025. *See* LA. REV. STAT. § 13:4202(B)(1).[8] And Marquette's proposal coheres with judicial practice: "Courts often look to invoices when fixing prejudgment interest." *Offshore Marine Contractors*, 779 F.3d at 351. Furthermore, Marquette's requested interest rate is reasonable. *Compare Eagle Eye Distributing, Inc. v. Ben Parker, Inc.*, No. 3:09-cv-95, 2009 WL 4251105, at *9 (N.D. Tex. Nov. 25, 2009) (importing invoices' interest rate of 1.5% in setting prejudgment interest rate), *with ING Bank, N.V. v. M/V Charana Naree*, 446 F. Supp. 3d 163, 176–77 (W.D. La. 2020) (rejecting a contractual interest rate of 36% in favor of Louisiana's judicial interest rate). The Court therefore orders Emerald to pay prejudgment interest of 1.5% on its five unpaid invoices from the time each was due until the entry of judgment. *See Central Boat Rentals*, 744 F. Supp. 3d at 640–41 (awarding maritime plaintiff prejudgment interest on unpaid invoices from the time they were due until the date of judgment).

***3. Attorney's Fees and Court Costs.*** Last, Marquette is entitled to attorney's fees and court costs. Typically, maritime litigants bear their own litigation expenses. *See Sea Link Cargo Services Inc. v. Marine Center Inc.*, 380 F. App'x 460, 463 (5th Cir. 2010) ("This is a maritime contract dispute, and maritime disputes generally are governed by the American Rule, pursuant to which each party bears its own costs.'") (quotation marks omitted). But these parties contracted around that general rule and agreed that the "Shipper" (Emerald) would pay the "Carrier" (Marquette) for any

---

[8] Louisiana's judicial interest rates for the lifespan of this litigation, 2022–2025, are 3.5%, 6.5%, 8.75%, and 8.25%. *See* Louisiana Office of Financial Institutions, *Judicial Interest Rates*, https://ofi.la.gov/legal/statutes-rules-policies-opinions/judicial-interest-rates/ (last visited Sept. 13, 2025).

"costs[,] including attorney's fees[,] incurred in seeking collection of any unpaid freight, demurrage, and/or related charges." Transportation Agreement at 4. Consistent with the parties' Transportation Agreement and the Court's judgment, Marquette is due attorney's fees and court expenses from Emerald. *See id.*; 28 U.S.C. § 1920 (enumerating recoverable court expenses).

## CONCLUSION

For the reasons stated above, the Court enters judgment in favor of Marquette on its breach-of-contract claim against Emerald in the amount of $381,896.32, plus prejudgment interest, reasonable attorney's fees, and court costs. The Court orders Marquette to confer with Emerald and submit, by no later than October 15, 2025, an agreed order, motion for fees and costs, or other appropriate request or update regarding interest, fees, and costs.

Benjamin Beaton, District Judge
United States District Court

September 15, 2025